# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:10CR00002 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **JOHNATHAN TRENTON** | ) | By: James P. Jones |
| **LEONARD, RYAN C. HILTON ,** | ) | United States District Judge |
| **CHUCK ALLEN HENSLEY, AND** | ) | |
| **CARRIE EVELYN JARRETT,** | ) | |
| | ) | |
| Defendants. | ) | |

 *Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Dennis E. Jones, Dennis E. Jones & Associates, P.C., Lebanon, Virginia, for Defendant Johnathan Trenton Leonard; Michael A. Bragg, Bragg Law, P.C., Abingdon, Virginia, for Defendant Ryan C. Hilton; David D. Walker, Salem, Virginia, for Defendant Chuck Allen Hensley; and Randall C. Eads, Abingdon, Virginia, for Defendant Carrie Evelyn Jarrett.*

 In this criminal case, I consider postverdict motions.

 The defendants, Johnathan Trenton Leonard, Ryan C. Hilton, Chuck Allen Hensley, and Carrie Evelyn Jarrett, were indicted in this court, along with 32 other defendants, for conspiring to distribute or possess with the intent to distribute certain controlled substances, in violation of 21 U.S.C.A. §§ 841 and 846 (West 1999 & Supp. 2010). Of the 36 individuals charged, only these four defendants elected to go to trial. After a seven-day joint trial, all of the defendants were convicted by the jury.

The government contended that the defendants were members of a large, seven-year-long, drug trafficking conspiracy centered around a family named Hutson, consisting of the mother, 63-year-old Phyllis Amos, and her children, April Shannon Hutson,[1] Rhonda Hutson, and Samuel Hutson, with Shannon Hutson being the main procurer of the illicit drugs. Shannon Hutson's children, including her daughter Kari Parks, were also distributors. The government alleged that the trafficking involved cocaine and, beginning in late 2008, included prescription pain medication, specifically OxyContin and Lortab. The conspiracy was centered in Northeast Tennessee, with some acts in furtherance of it occurring in neighboring Southwest Virginia.

The defendants have filed timely motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). A central theme of the motions is that the government failed to prove that the defendants were part of the conspiracy charged, although different arguments are used in support of this contention. The motions have been briefed and heard, and are ripe for decision.

---

[1] Shannon Hutson is referred to in the record as both April Hutson and Shannon Hutson. For convenience, in this Opinion she will be called Shannon Hutson, in accordance with most of the references.

After careful consideration of the record and of the arguments made by counsel, I will deny the motions by Johnathan Trenton Leonard, Chuck Allen Hensley, and Carrie Evelyn Jarrett, but I will grant the Motion for Judgment of Acquittal by Ryan C. Hilton.

I

The defendants argue that they cannot legally be convicted of the conspiracy charged in the Indictment, in light of the evidence and the jury verdict findings that none of them participated in the distribution or possession of all three of the controlled substances. In other words, because the Indictment described the conspiracy as involving all three controlled substances, the defendants contend that the government was required to prove that each defendant was involved in distributing each drug. As shown herein, that argument is unavailing.

Count One of the Indictment charged the defendants as follows:

1. On or about and between January 1, 2003, and January 13, 2010, in the Western District of Virginia and elsewhere, [the defendants] knowingly conspired together and with others, known and unknown to the grand jury, to distribute and possess with the intent to distribute five kilograms or more of cocaine, OxyContin (oxycodone) and its equivalents, Schedule II controlled substances, and Lortab (hydrocodone) and its equivalents, a Schedule III controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.    All in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), 841(b)(1)(C), and 841(b)(1)(D).

(Indictment 2-3.)[2]

As part of the final jury charge in the defendants' trial, the court instructed the jury as follows:

> The defendants are charged with conspiracy to distribute or to possess with intent to distribute five kilograms or more of cocaine, as well as OxyContin (oxycodone) and Lortab (hydrocodone). You may find a defendant guilty of the offense, however, if the type or quantity of the controlled substance for which he or she should be held responsible is different than charged for the conspiracy as a whole. Thus the verdict form prepared with respect to each defendant will require, if you find the defendant guilty, to specify on the verdict form your unanimous finding concerning the type of drugs and the quantity of cocaine, if any, attributable to the defendant. The burden of proof is on the government to prove beyond a reasonable doubt the type and quantity of drugs attributable to the defendant.

> The type and quantity includes the drugs fellow conspirators distributed or possessed with intent to distribute, if you find that such distribution or possession was a necessary or natural consequence of the defendant's agreement or understanding and was reasonably foreseeable by the defendant.

> Your verdict must be unanimous in this regard. In other words, you must unanimously agree as to the specific drugs involved, as well as the quantity.

(Final Jury Instructions p. 16.)

---

[2]  There are only two counts of the Indictment. All 36 defendants were charged in Count One. Shannon Hutson was charged as the only defendant in Count Two with possessing and distributing cocaine.

- 4 -

The jury returned separate verdicts as to each defendant, finding each guilty of the conspiracy charge, and the drugs attributable as follows:

Defendant Leonard — OxyContin and Lortab;

Defendant Hilton — OxyContin;

Defendant Hensley — Cocaine (at least 500 grams, but less than 5 kilograms); and Lortab; and

Defendant Jarrett — Cocaine (at least 500 grams, but less than 5 kilograms) and Lortab.

The underlying substantive federal drug law is 21 U.S.C.A. § 841, which criminalizes the distribution of controlled substances. "The type of drug charged in [an § 841] count is immaterial; the critical fact is that the substance is controlled, not that it is one variety or another." *United States v. Townsend*, 924 F.2d 1385, 1402 (7th Cir. 1991).

Had the defendants been indicted on a conspiracy to distribute controlled substances generally, without naming specific drugs, that basic charge would fulfill the government's minimum notice obligation. *See, e.g.*, *United States v. Holland*, 494 F. Supp. 918, 922 (D. Md. 1980). Indeed, a primary reason the government lists specific drugs and drug quantities in an indictment is to serve its own sentencing purposes. *See United States v. Foster*, 507 F.3d 233, 249-51 (4th Cir. 2007) (holding

that in order for the statutory maximums and mandatory minimums contained in 21 U.S.C.A. § 841(b) to apply, the court must instruct the jury to determine the drug type and quantities reasonably attributable to each coconspirator).

Moreover, a conspiracy conviction in a case involving multiple types of drugs does not require the government to link each defendant to each drug. *See, e.g. United States v. Banks*, 10 F.3d 1044, 1054-55 (4th Cir. 1993) (holding that evidence showing a defendant involved in heroin transactions was sufficient to prove his participation in a singe large-scale drug conspiracy to distribute multiple types of drugs); *United States v. Garciga*, No. 97-4160, 1998 WL 66597, at *1 (4th Cir. Feb. 19, 1998) (unpublished) (asserting that a defendant "need not have dealt directly in all the controlled substances in which the conspiracy dealt to be found part of the conspiracy"); *United States v. Przenkop*, Nos. 95-5069, 95-5124, 95-5209, 1996 WL 654378, at *2 (4th Cir. Nov. 12, 1996) (unpublished) (affirming conspiracy conviction related to both marijuana and cocaine where one member traded for cocaine and another member for marijuana through an intermediary); *see also United States v. Edwards*, 105 F.3d 1179, 1182 (7th Cir. 1997), *aff'd*, 523 U.S. 511 (1998) (finding no error with jury instructions in a multi-drug conspiracy charge because the substantive underlying offense is a conspiracy to distribute *any* drug proscribed as a controlled substance); *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir. 1982) ("The

mere fact that more than one substance is charged, however, does not mean there are multiple conspiracies"); and *United States v. Moten*, 564 F.2d 620, 625 (2d Cir. 1977) (finding that the involvement of two drugs (cocaine and heroin) was "not significant" to the single versus multiple conspiracy issue).

The defendants argue that because the grand jury chose to list three drugs in the Indictment, it thereby defined the scope of the conspiracy as involving all three drugs. While defendants are correct that "[t]o determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment," *United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001), "[t]he indictment establishes the outer limits of the scope of the conspiracy . . . . In other words, the indictment establishes a ceiling not a floor." *United States v. Kang*, 715 F. Supp. 2d 657, 673 (D.S.C. 2010). In part, the defendants' argument is thus an effort to reintroduce a previously unsuccessful duplicity argument, which must again be rejected.[3]

Finally, while a defendant may claim that he or she was not a member of the larger conspiracy charged, but instead only a part of a separate conspiracy, that is normally a factual issue for the jury, *United States v. Urbanik*, 801 F.2d 692, 695 (4th

---

[3] The defendants raised a duplicity argument in pre-trial motions, which was rejected after hearing and recommendation by the magistrate judge. (Report & Recommendation 5-7, Mar. 24, 2010, *adopted by* Order, Apr. 19, 2010.)

Cir. 1986), separate from the question of which drug and its quantity should be attributed to the defendant for sentencing purposes. In this case, the defendants received a multiple-conspiracy jury instruction to support a defense that they were at most members of separate and uncharged conspiracies.[4]

---

[4] The instruction provided as follows:

In order to sustain its burden of proof for the charge of conspiracy, the government must show that the conspiracy alleged in the indictment existed. Proof of separate or independent conspiracies is not sufficient. Whether the evidence proves a single conspiracy or two or more multiple conspiracies is a question of fact which you must decide.

In order for you to find a single conspiracy, there must be some overlap of key actors, methods, goals, and objectives. In other words, there must be enough evidence for you to conclude, beyond a reasonable doubt, that there was one overall agreement or one general business venture.

On the other hand, as I have instructed, it is not necessary for the government to prove that a defendant knew all of his or her co-conspirators, or that he or she was aware of all the details of the criminal activity, for you to conclude that there was a single conspiracy. I further instruct you that it is possible for members of a single conspiracy to work in parallel positions, or even to compete against one another, without becoming a separate or additional conspiracy.

In summary, you should consider all relevant evidence — including any evidence of common actors, goals, objectives, time periods, places or territories — and decide whether it proves a single conspiracy, multiple conspiracies, or no conspiracy at all.

(Final Jury Instructions p. 17.)

In summary, the facts that multiple drugs were charged as objects of the conspiracy and that the evidence and the jury verdict did not attribute each drug charged to each defendant are not by themselves sufficient grounds for setting aside the convictions.

## II

In a related argument, the defendants contend that the jury instructions constructively amended the Indictment by allowing the jury to convict based upon participation with less than all of the three charged drugs. It is contended that the jury instructions were internally inconsistent, because the jury was instructed that in order to convict, it must find that the government proved beyond a reasonable doubt that, "[t]he purpose or object of the agreement was either the distribution of, or the possession of with the intent to distribute, certain controlled substances <u>as charged</u>" (Final Jury Instruction p. 14) and also instructed that "You may find the defendant guilty of the offense, however, <u>if the type or quantity of the controlled substance for which he or she should be held responsible is different than charged for the conspiracy as a whole</u>" (Final Jury Instructions p. 16) (emphasis added)).

Essentially, the argument is that because the Indictment charged that the defendants conspired to distribute all three drugs, the second quoted passage inappropriately broadened the basis of conviction.

As shown above, however, it is not necessary for the government to link each defendant with each drug in order to convict for a conspiracy involving multiple drugs. Moreover, "when the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive." *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009). As a general rule, when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged. *United States v. Hawkes*, 753 F.2d 355, 357 (4th Cir. 1985) (citing *Turner v. United States*, 396 U.S. 398, 420 (1970)). In the present case, the jury attributed at least one drug to each defendant and thus it deemed the evidence sufficient as to the attributed drugs.

For these reasons, the instructions provided to the jury do not support the granting of a new trial.

III

Regardless of the lack of merit in the defendants' purely legal arguments, the evidence against each defendant must still sufficiently support his or her guilt of the conspiracy charged. "The breadth of § 841(a) does not obviate the government's obligation to show that [the defendants] conspired to violate § 841(a) with the group named in the indictment." *Townsend*, 924 F.2d at 1402.

In order to convict a defendant of drug conspiracy, the government must prove beyond a reasonable doubt the following three elements: "(1) an agreement between two or more persons to engage in conduct that violates a federal drug law . . . ; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy." *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (internal quotation marks and citation omitted). The conspiracy may be proved "inferentially and by circumstantial evidence." *Id.* (internal quotation marks and citation omitted). Because criminal conspiracies are "clandestine and covert," there is "frequently . . . little direct evidence of such an agreement." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).

In addition, a member of a conspiracy may not know its full scope or partake in its full range of activities. "[O]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the

conspiracy to support conviction." *Id.* at 861 (quotation marks and citation omitted).

"The term 'slight' does not describe the *quantum* of evidence that the Government must elicit in order to establish the conspiracy, but rather the *connection* that the defendant maintains with the conspiracy." *Id.*

The defendants argue that the evidence presented at trial was insufficient to support their participation in the single, large-scale conspiracy alleged. They argue that the evidence showed, at best, that the defendants participated in different and unrelated relationships with the Hutsons.[5]

Conspiracy variance claims, in essence, challenge the sufficiency of the evidence supporting the jury's verdict that each defendant was a member of the same conspiracy. *Townsend*, 924 F.2d at 1389; *see also Banks*, 10 F.3d at 1050 n.1 (describing a multiple conspiracy challenge as a "type [of] evidence-sufficiency issue"). The government bears the burden of proving the single conspiracy charged. *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983).

---

[5] Similar arguments often compare "hub-and-spoke," "rimless wheel," and "chain" conspiracies. Although these terms may provide a metaphorical picture for the multiple-versus-single-conspiracy issue, one should not fixate on these images. "Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical molecular or atomic forms." *United States v. Perez*, 489 F.2d 51, 59 n.11 (5th Cir. 1973).

A single conspiracy exists where there is "one overall agreement" or "one general business venture." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) (internal quotation marks and citations omitted). "Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *Id.* This overlap cannot be determined woodenly. A drug conspiracy is unlikely to have "a discrete, identifiable organizational structure," but rather is more likely "a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market." *Banks*, 10 F.3d at 1054.

Perhaps unsurprisingly, therefore, in similar multi-drug conspiracy cases, the definition of the conspiracy's object, and thus the agreement entered into by its participants, depends highly on the characterization of the particular market of the conspiracy. In some cases, the conspiracy's object has been defined by region, others by the controlled substances peddled, and still others by the drugs' supply source. *See Banks*, 10 F.3d at 1054 (defining the conspiracy as satisfying the "massive consumer market for heroin and cocaine in the general Tidewater area of Virginia"); *United States v. Newton*, 141 F. App'x. 114, 117 (4th Cir. 2005) (unpublished) (defining the conspiracy as "distribution of narcotics to users in the Front Royal [Virginia] area); *Urbanik*, 801 F.2d at 696 (defining the object of the

- 13 -

conspiracy as "the wide-scale possession and distribution of marijuana and cocaine");

*United States v. Valentine*, No. 94-5482, 1995 WL 570431, at *1 (4th Cir. Sept. 28,

1995) (unpublished) (defining the scope of the conspiracy as including both heroin

and crack cocaine)*; United States v. Sicle*, Nos. 92-5365, 92-5378, 92-5379, 1993 WL

280488, at *6 (4th Cir. July 26, 1993) (unpublished) (establishing the conspiratorial

enterprise as "distributing multi-kilogram quantities of cocaine"); *United States v.*

*Reeves*, No. 98-4115, 1999 WL 150830, at *2 (4th Cir. Mar. 19, 1999) (unpublished)

(describing the conspiracy's aim as protecting the "'big family'" that worked together

in a multi-drug distribution business)*; United States v. Holland*, 59 F. Supp. 2d 494,

531 (D. Md. 1998) (defining the conspiratorial goal as distributing to consumers

"'Holland's drugs'").

A participant's knowledge of and interest in the conspiracy may be inferred by

"the regularity and volume of dealings" of an individual with the distribution system,

even if the individual performs "distribution functions in separate localities without

specific knowledge of the existence or numbers of such other persons and localities."

*United States v. Burman*, 584 F.2d 1354, 1356-57 (4th Cir. 1978). The Fourth Circuit

has repeatedly rejected multiple conspiracy defenses where the evidence showed an

individual's ongoing participation in a drug enterprise and the inference of

knowledge and accession that goes along with such participation. *See, e.g. Banks*, 10

F.3d at 1054 (noting that such evidence demonstrates "a substantial level of commitment" to the conspiracy's aims).

By contrast, "multiple conspiracies exist where the evidence shows separate networks operating independently of each other." *Barlin*, 686 F.2d at 89. A network demonstrating multiple conspiracies has been characterized as "comple[x] either with respect to persons, lines of communication, or distribution." *Id.* In a multiple conspiracy scenario, each individual's agreement is "distinct and disconnected, not part[] of a larger general scheme" and has "its own distinct, legal end." *Blumenthal v. United States*, 332 U.S. 539, 558 (1947). Where the conspiracies lack a substantial overlap in time, participants, facts, or aims, multiple conspiracies should be found. *See United States v. Weaver*, 905 F.2d 1466, 1477-78 (11th Cir. 1990).

In drug cases, a defense related to the multiple conspiracy concept is the so-called "buyer-seller" defense. In this defense, the individual argues that there was no agreement to participate in the drug distribution operation, but rather that the parties' agreement did not transcend the scope of the immediate transactions. Essentially, the defendant's participation was limited to fulfilling and facilitating his or her own personal drug consumption needs. In *United States v. Giunta*, 925 F.2d 758, 767 (4th Cir. 1991), *overruled on other grounds by United States v. Burgos*, 94 F.3d at 859, the Fourth Circuit held that one does not come within the ambit of § 846 by merely

facilitating a sale. Likewise, a drug addict does not automatically participate in the conspiracy by simply providing a market for the drug, although such evidence may be probative of a conspiratorial relationship. *United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993).[6]

Addressing these defenses thus requires examining whether the evidence presented shows individual agreement to participate in the conspiracy as charged. As noted above, the government fashioned its case as a large-scale drug trafficking conspiracy led by the Hutson family, and located in a specific geographical region. Thus, the issue is whether the evidence sufficiently supports the jury's findings that the defendants agreed to participate in the Hutson operation, or rather, whether the evidence showed only participation in smaller, unrelated drug operations or simple buy-sell relationships with the Hutsons.

In considering the evidence, I must keep in mind that "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *Burgos*, 94 F.3d at 862 (internal quotation marks and citation

---

[6] In the present case, the jury was instructed that "[t]he mere purchase or receipt of illegal drugs by a user of the drugs, without resale or distribution, but solely for personal use, does not of itself make the purchaser a conspirator. However, the circumstances surrounding any such purchase or receipt may be considered by you along with all of the other circumstances as shown by the evidence, in determining whether the purchaser knowingly joined the conspiracy charged with the intent to further its purpose." (Final Jury Instructions p. 15.)

omitted).  In this process, I view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the government.  *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).  The question is whether the convictions are supported by substantial evidence which is defined as "evidence that a reasonable finder of fact  could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (internal quotation marks and citation omitted).

Keeping these principles in mind, I will review the evidence against each defendant.

JOHNATHAN TRENTON LEONARD.

Law enforcement officers followed defendant Johnathan Trenton  Leonard and Shannon Hutson and observed them meet with a drug courier in a restaurant parking lot off of Interstate 40.  They were stopped after the meeting and approximately $7,000 in cash and over 3,000 OxyContin and Lortab tablets were discovered in a locked bag, to which Hutson had a key.  The drug courier, from Michigan, was also arrested after the meeting and found to be in possession of $74,220 in currency.

During the course of the investigation by law enforcement, Leonard was observed associating with members of the Hutson family and other defendants in the conspiracy, and was described by one witness as having "an affair" with Shannon

Hutson. (Trial Tr. 203, May 13, 2010.) One member of the conspiracy testified that Shannon Hutson "fronted" Leonard with OxyContin to sell. (*Id.* at 34-36.) Another member testified that Leonard sold him OxyContin tablets and told him that they came from Shannon Hutson. (*Id.* at 126.) A coconspirator who testified had observed Leonard and Shannon Hutson on the bed in her bedroom, counting OxyContin and Lortab tablets into baggies for resale. (*Id.* at 203-05.)

Accepting this evidence in the light most favorable to the government, the jury could reasonably find that Leonard participated in the central conspiracy charged, based upon his close relationship with a key player, the time frame involved, and the methods utilized. The jury could infer that Leonard had knowledge that the Hutsons and their associates were engaged in large-scale illegal drug distribution even though the jury did not attribute one of the drugs — cocaine — to him.

Based on the evidence, Leonard's conviction will not be set aside.

### CHUCK ALLEN HENSLEY.

Hensley and Rhonda Hutson were in a romantic relationship and Hensley lived for a time with her in her home. In a confession Hensley made to law enforcement authorities (Trial Tr. 25-44, May 11, 2010), he gave detailed information about the Hutson drug operation, including its distribution of large amounts of cocaine and prescription pain pills, which an agent testified was "pretty much . . . right on," based

on the investigation. (*Id.* at 104.) Hensley confirmed that he and Rhonda had set up a roof guttering business in order to launder money received from the Hutson drug operations. He also admitted having made trips to North Carolina to obtain cocaine for distribution and to have assisted in counting the cash received from drug sales, which according to him amounted to $50,000 to $60,000 on a biweekly basis.

Hensley testified at trial on his own behalf. He admitted his relationship with Rhonda Hutson and that she had supplied him with Lortab for his own use, but contended that he had "no idea" about the extent of her drug dealing. (Trial Tr. 206-07, May 17, 2010.) He claimed that he had lied to the police about his personal knowledge of the Hutson operation in order to seek revenge against Rhonda after she "kicked [him] out" and refused to pay him what he was owed from their guttering business. (*Id.* at 204-05, 219.) He denied having distributed any drugs or having been part of a conspiracy to do so.

Brian Keith Proffitt, a member of the conspiracy who pleaded guilty, testified for the government. He was one of Rhonda Hutson's several other boyfriends, and testified that Hensley had sold him cocaine "a lot" (Trial Tr. 108, May 12, 2010) and that Hensley had obtained cocaine from Junior Stiltner, another one of Rhonda's boyfriends and a coconspirator.

Based on this evidence, and other substantial evidence presented at trial concerning the nature and extent of the conspiracy, the jury was fully justified in finding that the government had proved beyond a reasonable doubt that Hensley was guilty.

RYAN C. HILTON.

A government agent testified at trial as to seized text messages between Hilton and Kari Parks, Shannon Hutson's daughter, in which Hilton sought to purchase pain pills from Parks and in which she asked him to "save me one . . . if you can or a half." (Trial Tr. 214, May 11, 2010.)  Hilton was also observed meeting with Parks, and on one occasion traveling together to the apartment of a charged conspirator and seller of OxyContin, Daniel Cosby.  (Trial Tr. 62-63, May 12, 2010.)

Jeffrey James Howell, another charged member of the Hutson conspiracy, testified for the government that he had sold OxyContin tablets to Hilton.  He explained that Hilton would ask him for a certain number of pills, and he would purchase the pills from a member of the Hutson organization with Hilton's money and deliver them to Hilton, keeping a pill or a half of a pill as his charge for this service. (Trial Tr. 11-13, May 13, 2010.)  According to Howell, Hilton had a job and thus had the necessary money to feed his OxyContin addiction.  He said that sometimes he and

Hilton would "do a pill" together, meaning that Howell would crush an OxyContin tablet and they would snort it together. (*Id.* at 15-16.)

When initially interviewed by an agent, Hilton lied about his drug use and purchasing pills from Howell and Parks. However, the agent testified that the investigation did not reveal that Hilton ever sold pills or cocaine. (Trial Tr. 63, May 12, 2010.)

Hilton testified at trial on his own behalf and explained that he had been heavily addicted to prescription pain medication and had purchased OxyContin over a period of about two years, first from Howell and then from Parks. He testified that he had understood that his drug sellers would by necessity have to obtain the pills from others, although he denied knowledge of the Hutson organization.

Hilton argues that this evidence showed only that he purchased pills for personal use to support his strong addiction. Hilton contends that the evidence was absent that he ever acted in a manner typically associated with joining a conspiracy, such as transporting, storing, handling drugs or drug money, or otherwise aiding the conspiracy's members.

The government asserts that Hilton's transactions and testimony demonstrated his knowledge that Howell and Parks were necessarily involved with third parties who supplied them with the pills that they in turn sold to Hilton. Moreover, it is

argued, on occasion those arrangements allowed Howell and Parks to keep part of the drugs which they purchased for Hilton. Government counsel argued at trial that this evidence showed that Hilton's involvement was not that of "a typical buyer/seller relationship," which "contemplates a very short term, almost instantaneous type [of relationship]." (Trial Tr. 135, May 14, 2010.)

After a careful review of the record, I find that the evidence presented was insufficient to convict Hilton of the charged conspiracy. As previously noted, the government's theory of prosecution centered on the large-scale Hutson conspiracy. Thus, Hilton's conviction required evidence of his agreement to participate in that operation. However, Hilton's willingness to sometimes share a pill with his dealer in the course of and in payment for the sale demonstrates participation only to facilitate the immediate transaction.

Moreover, the fact that Hilton would by necessity know that his immediate sellers needed to deal with others in order to obtain the drugs is not instructive, in light of the complete absence of evidence of Hilton's knowledge concerning the Hutson organization.

A conviction under 21 U.S.C.A. § 846 "requires more than a conspiracy to attempt to arrange a purchase." *See United States v. Melchor-Lopez*, 627 F.2d 886, 892 (9th Cir. 1980). While evidence of a buy-sell relationship is probative on the

issue of whether a conspiratorial relationship exists, especially when coupled with a substantial quantity of drugs, such a relationship is not by itself dispositive evidence. *See United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993). Rather, the evidence must go beyond the immediate transaction to show that the buyer and seller "agreed to work together to further the distribution to third parties." *United States v. Jones*, No. 94-5403, 1996 WL 226616, at *3 (4th Cir. May 6, 1996) (unpublished). Without such an agreement, the buyer and seller have not finalized any act essential to a conspiracy conviction.

Instead, even if the seller has the requisite intent, the buyer's agreement is limited to the single-minded goal of satisfying his own habit. "[C]onspiracy requires agreement between at least two persons to take concerted action," and "if the purposes of alleged co-conspirators are different, though both are aimed at unlawful goals, there is no conspiracy." *United States v. Giunta*, 925 F.2d at 764. The purposes of the involved parties differ, and no criminal agreement has been completed.

It is true that Hilton's purchases of OxyContin from Howell and then from Parks constituted more than a short term relationship, because Hilton purchased pills from these two drug dealers over a period of months. But there is no evidence from which a jury could properly infer that the purchases were other than to feed his own habit. There was no evidence, for example, that he bought on occasion such a large quantity

of pills as to raise the inference that at least some of them were for resale. *See United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008) ("[E]vidence of [a buyer-seller] relationship, when combined with evidence of a substantial quantity of drugs . . . would support a reasonable inference that the parties were coconspirators.") (internal quotation marks and citation omitted).[7]

While Hilton certainly had an unlawful goal in obtaining the drugs, this goal was not that targeted by the conspiracy as charged. The evidence did not show Hilton's agreement to advance the Hutson operation or to distribute to any third parties beyond the buyer-seller transaction before him. The sole fact that Hilton sometimes paid the person who delivered drugs to him with a pill, rather than with money, does not place him on the conspiracy side of the equation. Thus, I find that Hilton's conspiracy conviction is not supported by sufficient evidence.[8]

---

[7] There was evidence that Howell sold three to ten pills to Hilton, one to three times per week. (Trial Tr. 198-99, May 12, 2010.) For an OxyContin addict, that is not a large amount. Certainly there was no evidence that this was a distributable amount.

[8] Hilton has alternatively sought a new trial. In accord with Federal Rule of Criminal Procedure 29(d)(1), I will conditionally grant that motion, on the ground that the verdict was against the weight of the evidence for the reasons stated above. A new trial would proceed if the judgment of acquittal is reversed and the appellate court does not order otherwise. Fed. R. Crim. P. 29(d)(3)(A).

## CARRIE EVELYN JARRETT.

A drug task force agent interviewed defendant Carrie Evelyn Jarrett in March of 2008 and testified at the trial about her statements. Jarrett identified Kari Parks, Shannon Hutson's daughter, as a cocaine dealer, and gave general information about the drug dealing of other individuals in the Hutson organization. She admitted that she had transported Robert Nelson, a codefendant, to Shannon Hutson's home when he had purchased cocaine (Trial Tr. 114, May 11, 2010), and that she had been present on many occasions at Nelson's home when either Shannon or Parks delivered cocaine to him. She confessed that she had purchased cocaine herself a number of times from Raymond Hilliard, another codefendant.

Jarrett was also interviewed by an agent in January of 2010, after she was arrested in this case. She again described the activities of persons in the conspiracy who sold drugs. She related that she had spent time at Raymond Hilliard's house and would obtain cocaine there for free. (*Id.* at 224.)

Brandon Kincer, a codefendant and Jarrett's brother-in-law, testified at trial for the government that he had purchased cocaine from Jarrett on 10 or 15 occasions in late 2007 and early 2008. (Trial Tr. 144-45, May 12, 2010.) Other government witnesses also testified that Jarrett had distributed cocaine. Considering this record, there was ample evidence to convict Jarrett of participation in the charged conspiracy.

The jury attributed both cocaine and Lortab to Jarrett for sentencing purposes. She argues that the evidence relating to Lortab was insufficient for this attribution, because the Lortab she allegedly sold came from a prescription Jarrett received from her dentist, and not from the Hutson drug conspiracy.

Michael Caudill and his wife, Heather Caudill, both testified at trial for the government that they had purchased Lortab from Jarrett as police informants. Michael's purchase was on September 17, 2009, and Heather's was a few days later, on September 22. Both testified without contradiction that the Lortab pills came from Jarrett's dental prescription. (Trial Tr. 301, May 13, 2010; Trial Tr. 23, May 14, 2010.)

This evidence was relevant to the conspiracy charge, since it showed Jarrett's knowledge and intent in regard to drug trafficking. Moreover, it was clearly established from the evidence that the distribution of Lortab was an object of the conspiracy and was engaged in by other coconspirators. Jarrett's sales of Lortab to the Caudills was evidence from which the jury could find that her coconspirators' distribution of this drug "was a necessary or natural consequence of the defendant's agreement or understanding and was reasonably foreseeable by the defendant" (Final Jury Instruction 16) and thus properly attributable to her.

## III

For the foregoing reasons, it is **ORDERED** as follows:

1.  The posttrial motions of the defendants Johnathan Trenton Leonard, Chuck Allen Hensley, and Carrie Evelyn Jarrett (ECF Nos. 992, 1397, 1409, 1438) are DENIED;

2.  The Motion for Judgment of Acquittal by Ryan C. Hilton (ECF No. 1303) is GRANTED and a separate judgment of acquittal as to this defendant will be entered herewith; and

3.  Pursuant to Federal Rule of Criminal Procedure 29(d)(1), the Motion for a New Trial by Ryan C. Hilton (ECF No. 1303) is conditionally GRANTED, subject to any appellate review of the judgment of acquittal.

ENTER: March 14, 2011

/s/ JAMES P. JONES
United States District Judge